# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00060-CV

**Rhonda Pratt and Bryan Pratt, Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
### NO. 34408, HONORABLE GUILFORD L. JONES III, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from an order terminating the parental rights of Rhonda Pratt and Bryan Pratt to their children, B.P. and B.K.P. Following a bench trial, the district court ordered the parents' rights terminated based upon its findings that both Rhonda and Bryan had failed to complete their court-ordered service plans as directed and that termination was in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(1)(O), (2) (West Supp. 2010). Rhonda and Bryan, who are both indigent, each filed a notice of appeal from the termination order. As required by the family code, they also each filed a statement of points on appeal. *See id*. § 263.405(b)(2) (West 2008). Each parent alleged a single point on appeal, namely that the evidence was insufficient to establish that termination was in the best interest of the children. For reasons we explain below, we will affirm the district court's order of termination.

## PROCEDURAL AND STATUTORY BACKGROUND

This appeal is governed by section 263.405 of the family code. Pursuant to that section, after Rhonda and Bryan filed their notices of appeal, the district court held a hearing to determine whether their point on appeal was frivolous. *See id*. § 263.405(d). The district court determined that it was.

"[A] trial court's determination that an appeal is frivolous has two statutory consequences." *In re K.D.*, 202 S.W.3d 860, 865 (Tex. App.—Fort Worth 2006, no pet.). First, it limits the scope of appellate review to the trial court's determination that the appeal is frivolous. *Id*. (citing Tex. Fam. Code Ann. § 263.405(g)). Second, a trial court's frivolousness determination has the consequence of denying an indigent appellant the right to a free clerk's record and reporter's record of the underlying trial. *Id*. (citing Tex. Civ. Prac. & Rem. Code Ann. § 13.003(a)(2)(A) (West 2002)).

However, appellants are entitled to appeal the trial court's finding that the appeal is frivolous by filing with the appellate court the reporter's record and clerk's record of the 263.405 hearing without advance payment of costs. Tex. Fam. Code Ann. § 263.405(g). Here, Rhonda and Bryan have brought forward the records from the 263.405 hearing, but filed briefs in which they purport to argue the merits of their sufficiency point. Although the inquiries may overlap, our review, strictly speaking, is confined to the frivolousness determination.

## STANDARD AND SCOPE OF REVIEW

We review a trial court's frivolousness finding under an abuse of discretion standard. *Lumpkin v. Department of Family & Protective Servs.*, 260 S.W.3d 524, 526-27

2

(Tex. App.—Houston [1st Dist.] 2008, no pet.). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Id*. (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). In undertaking our review, we limit our review to the parents' statement of points on appeal and the record from the hearing held pursuant to section 263.405(d) of the family code. *See* Tex. Fam. Code Ann. § 263.405(d), (g), (i); *In re B.G.*, 317 S.W.3d 250, 258 (Tex. 2010). "In determining whether an appeal is frivolous, a judge may consider whether the appellant has presented a substantial question for appellate review." Tex. Civ. Prac. & Rem. Code Ann. § 13.003(b); *see* Tex. Fam. Code Ann. § 263.405(d)(3) (incorporating by reference section 13.003(b)). In other words, an appeal point is frivolous "when it lacks an arguable basis either in law or in fact." *Lumpkin*, 260 S.W.3d at 527.

To terminate parental rights, the proponent must prove by clear and convincing evidence that a parent committed one or more of the acts or omissions set forth in Section 161.001(1) of the family code and that termination is in the children's best interest. *See In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re B.L.D.*, 113 S.W.3d 340, 353-54 (Tex. 2003); *Richardson v. Green*, 677 S.W.2d 497, 499 (Tex. 1984); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). In this case, however, Rhonda and Bryan challenge only the district court's best-interest finding. Thus, the only question in this case is whether Rhonda and Bryan's sole point on appeal—that the evidence was insufficient to establish that termination was in the best interest of the children—lacks an arguable basis either in law or fact.

3

## ANALYSIS

There are numerous factors a trier of fact may consider in determining the best interest of the child, including but not limited to:  (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.  *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).  The supreme court has "never held that these considerations are exhaustive, or that all such considerations must be proved as a condition precedent to parental termination." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).  Moreover, "[t]he absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.*

During the 263.405 hearing, the district court took judicial notice of the evidence presented at the termination trial and the contents of the court's case file, including the pretrial deposition of State's witness Paul Johnson, a licensed clinical social worker who had served as the children's therapist beginning in 2007 after they had been removed from their parents' home and placed in foster care.  As no reporter's record of the termination trial has been provided, our review

4

of the evidence is limited to the evidence from the 263.405 hearing, which consists of Johnson's deposition testimony, a copy of which has been included in the clerk's record. *See In re A.S.*, 239 S.W.3d 390, 392-93 (Tex. App.—Beaumont 2007, no pet.) (affirming trial court's frivolousness finding on sufficiency point because "[t]he evidence described in the hearing does not present a substantial question for appellate review"); *see also Salazar v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00603-CV, 2011 Tex. App. LEXIS 3458, at *1-2 (Tex. App.—Austin May 5, 2011, no pet. h.) (mem. op.) (in reviewing trial court's frivolousness finding, considering documents included in clerk's record when no reporter's record of termination trial was provided); *Taylor v. Texas Dep't of Family & Protective Servs.*, No. 03-09-00684-CV, 2010 Tex. App. LEXIS 6107, at *2-4 (Tex. App.—Austin July 16, 2010) (per curiam) (order) (affirming trial court's frivolousness finding on sufficiency challenge based on documents in clerk's record and reporter's record of 263.405 hearing).[1]

---

[1] We note that appellants relied heavily on Johnson's deposition testimony in making their best-interest argument at the hearing. Because that deposition testimony has been provided, this is not a case in which we are unable to determine from the record of the 263.405 hearing whether the point on appeal is frivolous. *Cf. Barnett v. Texas Dep't of Family & Protective Servs.*, No. 03-09-00429-CV, 2010 Tex. App. LEXIS 606, at *5-6 & n.6 (Tex. App.—Austin Jan. 14, 2010) (per curiam) (order) (in appeal from frivolousness finding on challenge to sufficiency of evidence, ordering trial court to prepare and file reporter's record containing "all of the evidence admitted at the termination trial" "under the theory that courts *may* order the record when necessary" to determine whether appeal is frivolous). We also observe that neither Rhonda nor Bryan have complained of the absence of the record of the termination trial, and the Department, in its brief, does not refer to evidence other than Johnson's deposition testimony to support the district court's best-interest finding. On the particular circumstances presented here, we conclude that ordering a record of the termination trial is not necessary and would result in unwarranted delay. *See* Tex. Fam. Code Ann. § 263.405(a) (West 2008) ("The appellate court shall render its final order or judgment with the least possible delay.").

5

Johnson testified that when he had first encountered B.P., who was fifteen years old at the time of trial, "she was very anxious, very defensive and guarded . . . very concerned about being in a safe place." Johnson attributed B.P.'s concerns to her home life while in the care of her parents. According to Johnson, "She had concerns about her safety there. She complained—she had stated that there were rats in the home, and she stated that she only—she had very limited clothing to wear, that there were a number of people coming in and out of the . . . home on a weekly basis, and people that she did not know." When asked how B.P. had progressed during their therapy sessions, Johnson testified, "The longer she stayed in the [foster] home and the more contact [] that I had with her, she improved significantly to where she wanted to stay in the home, she wanted to be adopted by the foster parents and she basically [behaved] very well in the home." Johnson added, "[S]he loved [her foster parents]. She told [the foster parents] . . . [that] she wanted them to adopt her. She wants to stay in the home, she feels safe there, she feels that she's getting all of her needs met there."

Regarding B.K.P., who had just turned fourteen at the time of trial, Johnson testified that when he had first encountered him, B.K.P. "was pretty oppositional [sic]" and "very guarded," "was a little overweight," and "had boils on his skin." Also, B.K.P. "did not like the idea of being in foster care and did not want to be separated from his parents." Because of behavioral problems, B.K.P. was moved out of the foster home and placed with his aunt. When Johnson last saw B.K.P., after he had been placed with his aunt, B.K.P. "seemed more relaxed, seemed to like where he was," and his "physical shape . . . had improved." B.K.P. had been "seen by a doctor and treated and the boils [had] cleared up."

In working with the children, Johnson had only met their parents in court on one or two occasions. His observations of the parents on those occasions, however, caused him concern. Johnson recalled, "Mr. Pratt did not say anything, and Mrs. Pratt was angry and allowed her temper to get the better of her. At one time . . . she stomped out of court when the Judge said something that she didn't agree with or didn't like." From this outburst, Johnson "realized that Mrs. Pratt can't control her own behavior, and it doesn't seem like she would be able to deal effectively with behaviors of the children. . . . If she's acting that way in court . . . I don't believe the children are going to get the modeling that they need for dealing with anger and frustration in a proper manner."

Johnson also expressed concerns regarding the conditions in the Pratt home. He testified, "From what the children described and from the descriptions I received from the case worker on the case, I was concerned that the house was not a safe place to be in." Johnson elaborated that "apparently there were rodents and insects" within the home and that "there were people coming in and out of the home that the children did not know. At one point in time the case worker visited the home on a surprise visit and found somebody hiding in the closet. Those kinds of things concerned me."

According to Johnson, in September 2008, a court order had named the Department managing conservator of the children and granted the parents visitation rights. On one such visit, in October 2008, "the parents brought a man called Thomas with them, which was strictly prohibited, and the parents knew this . . . so the visit had to be cut short." Johnson added that there was "a pattern of behavior on the part of the Pratts to not adhere to the CPS guidelines" and "consistent noncompliance with CPS requirements." Johnson "didn't feel that the children were being served

7

well by the visits." They become "anxious before the visits, and then during the visits or after the visits . . . they act out, and there's . . . an observable difference in their behavior before and after the visits." Johnson also expressed concern that the parents were "confusing" and "upsetting" the children by telling them "that things were getting better, they were working, their situation was improving, and they were telling the children this during the visits. However, according to CPS . . . this was not true. In fact, things . . . were either the same, that is, not very good, or they were deteriorating." The confusion that the parents were causing the children, Johnson explained, "results in children's behaviors deteriorating where they act out, they become aggressive, they become noncompliant, and that was one of the problems that led to [B.K.P.]'s being removed from the [foster] home." As a result of the problems Johnson believed the parents were causing, he had recommended that the parents' visitation rights to the children be suspended for an "undetermined amount of time" to allow the children "to focus on their school work without having these constant interruptions with these visits which proved to be detrimental to the children."[2]

In Johnson's opinion, based on the information he had gathered, Rhonda did not provide a mentally and physically stable environment for the children. As for his opinion of Bryan's parenting ability, Johnson testified that "it's really hard to form an opinion about somebody that doesn't talk when you meet them." Nevertheless, Johnson concluded, "I guess . . . I don't have a lot of confidence in either Mr. or Mrs. Pratt being able to provide any positive support for their children . . . based on what I've heard from the children themselves."

---

[2] Johnson testified that although he "recommended that we stop the visits," he did not have anything to do with the Department's decision to terminate parental rights. Johnson also testified that at some point prior to the Department seeking termination, the visits had resumed.

8

On cross-examination, Johnson explained that his opinions were based on years of receiving information from the children, the Department, and the foster parents. He summarized this information as follows: "The house was filthy and dirty. It was unsafe to have a lot of strange people going in and out. There were allegations of drug use around the house, and I think the evidence you have to focus on [is] that in spite of CPS trying to intervene and change it, it never changed and the Pratts continued to allow it to happen." Johnson was unable to testify to anything "good" regarding the Pratts' living situation because he "didn't hear any specific information about good things they did." Johnson acknowledged, however, that he had never been inside the Pratts' home or personally interviewed them and thus could only testify as to what he had been told by others. When asked why the Department was seeking termination, Johnson testified, "I haven't spoken to CPS in quite a while about this case. But my understanding is that [B.P.] wants to be adopted by the [foster parents], and I believe they're seeking termination so that they can accomplish that and not have to rely on visits."

Johnson was also asked about whether he and others may have "unduly influenced" the children by telling them "some bad things about their parents." Johnson acknowledged that "if you talk about behaviors and that these behaviors are interpreted as bad, sometimes they have to be discussed and you can't get around it." "But," he added, "I don't talk to them about their parents in a way that's telling them that their parents are bad people, because that's not true, and I don't want to convey that to them."

At the 263.405 hearing, Rhonda's attorney stated that his "primary argument" regarding best interest was "set out in Mr. Paul Johnson's deposition and primarily in my cross-

9

examination of him."[3]  Rhonda's attorney asserted that "the whole case of best interest depended on what the children say.  You talked to the children.  And CPS's position . . . has to do with the kids want the termination to take place and they want the adoption to take place.  However most of the evidence came when you talked to the children on your own.  I talked to both children myself and you can understand what they were saying."  Rhonda's attorney went on to argue that the children's desires should be discounted because the children were exposed to "a lot of undue influence" by Johnson, CPS, and others.  Referring to excerpts from Johnson's deposition testimony, Rhonda's attorney explained,

> And Mr. Johnson, in response to some of my questions, stated that most of the evidence he got—and the presentations of the bad facts about the parents, these kids were told over and over and over about all the bad things [the parents] were doing and none of the good things that they did. . . .  So these kids were bombarded with negativity, negativity, negativity, over and over and over.  And so that's our primary concern. . . . that too much undue influence . . . affected the kids and that's why the kids talked to you and talked to me.

The district court was not persuaded by this argument.  It explained, "You know, as is the case in these types [of] cases always, it's never one thing that factors into it.  The children's desires are large, together with the changed circumstance that a viable, very viable adoption became available.  Those are two large ones."  After briefly addressing an additional argument regarding Rhonda's alleged failure to support the children,[4] the court continued,

---

[3]  Only Rhonda's attorney presented argument at the hearing; Bryan's attorney did not appear.

[4]  An issue that was not preserved for review in Rhonda's statement of points.

Also you cannot ignore in a current hearing what's in the best interest knowing the background of the case and the background of the circumstances, the background of the housing, the background of the people through the house, the background of the people the children are exposed to. And let's face it, had a viable adoption been available previously, this would've happened back then. Just no question about it. It's an overwhelming case. It's not a hard case to decide on the facts, and I don't see any viability in an appeal whatsoever. I don't fault you for filing it. . . . But there's just no way to get there from here in my judgment, so the Court does find that an appeal would be frivolous.

Based on the above record, we cannot conclude that the district court abused its discretion in finding that Rhonda and Bryan's point on appeal has no arguable basis in law or fact. Again, their sufficiency challenge was limited to the issue of whether termination was in the best interest of the children, and there are a multitude of factors that a trier of fact may consider when making that determination. *See Holley*, 544 S.W.2d at 371-72. Johnson provided testimony that was relevant to several of those factors, including the desires of the children, the emotional and physical needs of the children, the plans for the children by the Department, and the acts or omissions of the parents which may indicate that the existing parent-child relationship is not a proper one. Regarding the desires of the children, Johnson testified that B.P. "loved" her foster parents and "wanted them to adopt her." In Johnson's words, "She wants to stay in the home, she feels safe there, she feels that she's getting all of her needs met there." Moreover, Rhonda's attorney acknowledged at the 263.405 hearing that "the kids want the termination to take place and they want the adoption to take place," although he claimed that the children's desires were the result of "undue influence" by Johnson and the Department. However, the only evidence of "undue influence" that Rhonda's attorney cited to was Johnson's deposition testimony that he and others had told the children that their parents were engaging in "bad" behavior. But Johnson also testified,

11

"I don't talk to them about their parents in a way that's telling them that their parents are bad people, because that's not true, and I don't want to convey that to them." The district court would not have abused its discretion in concluding that whatever Johnson and others may have told the children regarding their parents' negative behavior did not amount to "undue influence." Nor would such evidence be singularly dispositive of best interest given the evidence presented that the parents were reportedly engaging in behavior that the district court could have found to be detrimental to the children's well-being.

Additionally, at the 263.405 hearing, Rhonda's attorney did not point to any evidence that disputed Johnson's testimony regarding the other factors. As summarized above, Johnson presented testimony from which the district court could reasonably infer that the emotional and physical needs of the children were being better met by the foster parents and B.K.P.'s aunt than by the children's parents; that the Department had an adoption planned for the children that, according to the district court, was "very viable"; that the parents' living situation was detrimental to the children in that the home was "filthy and dirty," infested with rodents, and that strangers were coming in and out of the home on a weekly basis; that the parents were not complying with CPS requirements; that Rhonda had problems controlling her temper; and that the parents were "confusing" and "upsetting" the children during their scheduled visits, which had caused the children "to act out." Johnson also testified that in his opinion, Rhonda did not provide a mentally and physically stable environment for the children and that he did not have "a lot of confidence in either Mr. or Mrs. Pratt being able to provide any positive support for their children."

Again, the only question presented in this case is whether the district court abused its discretion in finding that appellants failed to present a substantial question for appellate review regarding the court's finding that termination was in the best interest of the children. On this record, we cannot conclude that it did.

## CONCLUSION

We affirm the district court's order of termination. *See Spencer v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00498-CV, 2010 Tex. App. LEXIS 10338, at *13 (Tex. App.—Austin Dec. 31, 2010, no pet.) (mem. op.) (affirming district court's termination order after concluding that district court did not abuse its discretion in finding appeal to be frivolous).

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:   July 21, 2011

13